NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0292n.06

No. 18-2132

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 26, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| SCOTT DAVID MCQUARRIE, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant Scott McQuarrie was convicted following jury and bench trials of: one count of making a false statement in connection with a loan renewal, one count of making a false statement to an agency of the United States, four counts of conversion/concealment of property pledged to the Farm Service Agency (FSA), two counts of making false statements under oath, one count of making a false bankruptcy declaration, one count of bankruptcy fraud, one count of conspiracy to commit bankruptcy fraud, one count of mail fraud, and one count of wire fraud. McQuarrie appeals his convictions and sentence. We **AFFIRM** his convictions, **VACATE** his sentence, and **REMAND** for resentencing.

## I. Background

### A. Factual Background

McQuarrie obtained several loans in 2001 and 2002 from the FSA to purchase a farm and finance the farm's operation. To secure these loans, McQuarrie gave FSA a mortgage and pledged personal property, including livestock, crops, and machinery, as collateral. McQuarrie never made

his required annual payments on these loans, but instead sought loan assistance, which resulted in the restructuring of his loans. As part of the loan restructuring process, the FSA required a re-appraisal of the collateral to "determine whether [it was] feasible for the Government to restructure the loans versus [liquidate] the account." R. 268, PID 2654. In December 2009, the appraiser met McQuarrie on his farm to value the items that had been pledged as collateral. Except for a baler that McQuarrie represented was owned by his father, McQuarrie claimed ownership of all the livestock and equipment that was listed as collateral. The FSA ultimately approved McQuarrie's request to restructure his loans, and the process was completed on July 20, 2011, when McQuarrie executed a new mortgage and signed new security agreements and an agreement regarding the use of collateral. Before McQuarrie signed these documents, James Monroe, an FSA farm loan manager, explained to him that by signing he was representing that he was the exclusive owner of the items and agreeing to the terms of the use of collateral agreement, which required that he obtain permission from the FSA before selling assets pledged as collateral.[1]

McQuarrie failed to make his required payments in 2011 or 2012. In March of 2012, McQuarrie's house was destroyed by a fire, and he requested compensation for the structure from his insurance company. Because the FSA held a mortgage on the house, the insurance company mailed McQuarrie a check that was jointly payable to McQuarrie and the FSA, which was deposited in a supervised bank account controlled by the FSA. In addition to the replacement cost of the structure, McQuarrie also sought reimbursement for lost household contents. He submitted receipts to the insurance company through his father's insurance agency. In March and October of 2012, the insurance company sent McQuarrie a series of checks totaling $30,824.82 to replace

---

[1] Despite this counseling, McQuarrie soon sold—without the FSA's permission—equipment, crops, and livestock that he had pledged to the FSA.

the contents. In March of 2013, McQuarrie asked Betty Garrett, another FSA loan manager, to release $30,824.82 from the supervised bank account to reimburse McQuarrie for the same contents. After reviewing the supporting documents from the insurance company that McQuarrie brought in, FSA issued McQuarrie a check for $30,824.82.[2] However, McQuarrie had excluded the two pages that showed that he had already been reimbursed for the contents. Additionally, as part of his request for reimbursement, he submitted an estimate for the replacement of a four-person hot tub. Before doing so, however, he altered the estimate to make it appear to be a receipt. The true cost of the replacement hot tub was several thousand dollars lower than the price reflected in the documents submitted by McQuarrie.

McQuarrie never paid the annual payment that was due in April of 2013. Thus, in August of 2013, Garrett went to McQuarrie's farm to perform an inspection and update the list of collateral for new security agreements.[3] During that visit, McQuarrie was handed the security agreement that he had signed in 2011, and he stated that he still owned all of the items that were listed. McQuarrie also provided updated livestock numbers to be incorporated into the new security agreement. In October 2013, McQuarrie went to the FSA office to discuss his delinquent payment and the likelihood that the agency would begin foreclosure proceedings to reclaim the collateral. During that meeting, Garrett attempted to have him sign the new security agreement that reflected the updated information that McQuarrie had provided, but McQuarrie refused, claiming that many

---

[2] McQuarrie deposited this check and transferred the funds into his father's account. His father then transferred $28,163 into McQuarrie's mother's bank account, and in April 2013, she wrote a check for that amount to FSA to pay McQuarrie's year-overdue 2012 farm loan payment.

[3] The record reflects that changes to the collateral (replaced items, lost livestock, etc.) would routinely be noted when new security agreements were executed in order to properly account for the FSA's interest in the collateral.

of the items on the list "had been sold, junked out or scrapped or he never owned [them] in the first place." R. 266, PID 3669. He also claimed that some of the cattle belonged to his father.

McQuarrie filed for bankruptcy in February 2014, but soon dismissed his petition, allowing the FSA to begin the foreclosure process. In April of 2014, Garrett contacted McQuarrie to ask when the agency could pick up the cattle. Despite having previously claimed complete ownership of the cattle in 2011 and partial ownership of the cattle in October 2013, McQuarrie now claimed that he did not own any of the cattle, and that the cattle in fact belonged to his father and another man. In June of 2014, Garrett returned to McQuarrie's residence to check the collateral and observed a fence surrounding the property with a gate across the driveway. Garrett was ultimately able to access the property to assess the collateral, though it does not appear that she spoke with McQuarrie. However, on September 9, 2014, Garrett spoke to McQuarrie when he visited the office. Garrett informed McQuarrie that she was going to have the pledged equipment sold at auction in October and needed to arrange to pick it up. Upon hearing this, McQuarrie "stated that he didn't own any equipment" and had merely listed it on the security agreement "because he thought he needed it for security to reschedule the loan." *Id.* at PID 3676. Garrett asked how he could sell equipment that was not his and McQuarrie responded that "he was going to be filing bankruptcy any day and so these issues didn't matter." *Id.* at PID 3676-77. McQuarrie re-filed for bankruptcy on September 25, 2014.

As part of the bankruptcy proceedings, McQuarrie completed schedules detailing his assets and liabilities. During this process, he made a number of false statements, including that he had

not sold any equipment during the two-year period before the filing of the bankruptcy petition,[4] that he had no ownership interest in the newly-opened Alpena General Store,[5] and that his records had been destroyed in the house fire.[6]

The Government began investigating McQuarrie's actions in the middle of 2014. During Agent McClutchey's resulting interview of McQuarrie, McQuarrie admitted that before the appraisal in 2011, he "piled as much equipment on [his] farm as [he] could to make it look like [he] was doing something. And [he] signed for it." R. 171-10, PID 914 (Excerpts from Transcript of McQuarrie's interview with Agent McClutchey on March 24, 2015). In short, he admitted to using his father's cattle and certain of his machinery to "inflate the appearance of [his] operation." *Id.* at PID 919.

### B. Procedural Background

McQuarrie was indicted in June 2016, on six counts alleging that he made false statements and converted or concealed collateral that had been pledged to secure his FSA loans. A third superseding indictment was returned in January 2018, which charged him with fourteen counts and added his parents as co-defendants.

Jury selection began on February 6, 2018. At the beginning of the process, the magistrate judge who was conducting voir dire provided each venire member with a list of background

---

[4] In fact, McQuarrie sold many items of equipment immediately before and even after the filing of the bankruptcy petition. He had additionally moved other items, including a TW 35 tractor and skid-steer, to his parents' property.

[5] McQuarrie's mother relayed to Agent Mark McClutchey, a special agent for the U.S. Department of Agriculture's Office of Inspector General, that opening the Alpena General Store "was Scott's dream, [but] that he couldn't have the store in his name because he was going through the bankruptcy process." R. 267, PID 2527-28. As a result, the store was placed in McQuarrie's mother's name.

[6] A search warrant executed on McQuarrie's parents' home revealed extensive records of many of these transactions kept by McQuarrie's mother.

questions to answer. A majority of the venirepersons had finished their introductions when the following colloquy occurred:

> **McQuarrie**: Your Honor, I'd like to request another attorney, please.
>
> **Court**: Oh, Mr. McQuarrie, we will discuss that at sidebar, please.
>
> **McQuarrie**: I—yeah, I'm not going to get tried fairly with the defense I have now—
>
> **Court**: I think maybe—
>
> **McQuarrie**: —and also the—
>
> **Court**: Sir, it would be best if we talk about that in private, so if you don't mind, if you would have a seat, and we will—perhaps this might be a good time to take a recess and let everybody stretch their legs and use the restroom.

R. 276, PID 4631-32.

Outside the presence of the venire, McQuarrie explained that he was requesting new counsel because he believed his counsel had been pressuring him to accept a plea deal and was therefore not prepared to represent him at trial.[7] After inquiring why McQuarrie felt this way and hearing from McQuarrie's attorney, the magistrate judge denied McQuarrie's request for new counsel. McQuarrie's counsel then expressed concern that McQuarrie's comments might have tainted the jury venire, and the magistrate judge responded that "Mr. McQuarrie didn't say anything too awful, just he wanted another attorney, but I don't think that that had any—you know, pervasive effect on the trial thus far." *Id.* at PID 4646. The magistrate judge twice said that she wanted to ensure that McQuarrie was not trying to undermine his own trial, and McQuarrie denied that this was his intention. McQuarrie's parents then moved for a mistrial, at which point the

---

[7] McQuarrie commented that he had received a letter from his attorney that "basically state[d] that [the attorney] is not going to represent [McQuarrie]." R. 276, PID 4634. After a discussion about the possible consequences of waiving the attorney-client privilege by divulging the letter's contents, McQuarrie did not elaborate on its contents on the record.

government suggested that a narrower remedy such as a curative instruction would be preferable. However, after taking a recess and conferring with the district court judge, the magistrate judge ultimately dismissed the entire jury panel.

The following week, a fourth superseding indictment was returned. As relevant here, the fourth superseding indictment made two changes to the charge of conversion/concealment of property in Count 4. It changed the date from "on or about March 3, 2012" to "[s]ometime after July 20, 2011" and changed the collateral that was converted or concealed from a jib plow to a TW 35 tractor. R. 103, PID 456. Two days before trial, McQuarrie filed an emergency motion to dismiss Count 4 due to the expiration of the statute of limitations. In response to McQuarrie's motion, the district court severed Count 4 from the rest of the superseding indictment and proceeded to trial. The jury convicted McQuarrie of twelve of the thirteen counts.[8] McQuarrie later waived his right to a jury trial on Count 4, and the district court found him guilty of that count in a bench trial. The district court denied McQuarrie's Rule 29 motion for a judgment of acquittal and Rule 33 motion for a new trial.

The United States Probation Office prepared a Pre-Sentence Investigation Report (PSR) in which it assessed McQuarrie two points under United States Sentencing Guidelines (USSG) § 3C1.1 for obstruction of justice by interrupting court proceedings to taint the jury pool and delay the start of his trial. The PSR also noted other conduct that appeared obstructive, including McQuarrie's refusal to leave his property when the FSA attempted to foreclose, and veiled threats McQuarrie allegedly made to anyone who placed a bid on his property at the foreclosure sale. The government argued that this additional conduct supported a second obstruction-of-justice

---

[8] The jury acquitted McQuarrie of Count 9, which charged him with making a false statement under oath in his bankruptcy proceedings.

enhancement.  During a pre-sentencing hearing on remaining objections, the district court agreed that multiple obstruction enhancements were warranted.  The final PSR scored two obstruction-of-justice enhancements: one related to McQuarrie's comments during voir dire and one related to the intimidation of witnesses and his refusal to leave his property.

McQuarrie was sentenced to concurrent terms of 70 months' imprisonment on Counts 1, 13, and 14; 60 months' imprisonment on Counts 2, 3, 5-8, and 10-12; and 15 months' imprisonment on Count 4.  In addition, the district court assessed $6,272.71 in costs because of McQuarrie's conduct during the first voir dire.  This included $5,666.04 in jury costs from the aborted jury selection and $606.67 in witness fees and lodging paid by the government for the witnesses who appeared for trial that day.

McQuarrie now challenges his convictions on multiple grounds, the imposition of the obstruction-of-justice enhancement for his conduct during voir dire, and the imposition of costs based on that conduct.

## II. Discussion

### A.  Denial of McQuarrie's Motion to Dismiss Count 4

McQuarrie contends that the district court erred by denying his motion to dismiss Count 4 on statute-of-limitations grounds.  We review the district court's decision de novo. *United States v. Grenier*, 513 F.3d 632, 636 (6th Cir. 2008).

Count 4 alleged that "[s]ometime after July 20, 2011," McQuarrie "concealed, removed, disposed of, and converted to his own use or to the use of another, property with a value in excess of $1,000, that is a TW 35 tractor pledged as collateral by Scott McQuarrie to the Secretary of Agriculture, acting through the Farm Service Agency."  R. 103, PID 456.  McQuarrie contended that Count 4 should be dismissed because the five-year statute of limitations period had elapsed.  Midway through trial on the remaining counts, the government filed its response to McQuarrie's

motion, contending that the crime charged in Count 4 was a continuing offense since McQuarrie "converted the TW 35 by concealing the tractor at his father's farm with the assistance of his father." R. 138, PID 623.

Declining to adopt the government's position, the district court instead determined that the limitations period on Count 4 had not run because the central thrust of the crime—preventing the FSA from repossessing its collateral—occurred in 2015 when McQuarrie, with the assistance of his father, prevented the FSA from repossessing the tractor by obfuscating who owned the equipment. In short, despite his previous claim of absolute ownership of the tractor in the security agreement and the other evidence indicating that the tractor was his,[9] McQuarrie moved the tractor to his father's farm and disclaimed ownership of the tractor only when the FSA began the process of repossessing it. His father then claimed ownership of the tractor when Agent McClutchey interviewed him in March of 2015. Because the fourth superseding indictment had been filed within five years of 2015, the district court rejected McQuarrie's argument that the limitations period had run and denied his motion to dismiss.

We agree with the district court that McQuarrie's motion was properly denied. In general, the statute of limitations begins to run when the crime is complete. *Toussie v. United States*, 397 U.S. 112, 115 (1970) (quoting *Pendergast v. United States,* 317 U.S. 412, 418 (1943)). The crime charged in Count 4 is subject to a five-year limitations period. *See* 18 U.S.C. § 3282. Thus, the government bore the burden to demonstrate that the crime charged in Count 4 was committed on or after February 14, 2013. It met its burden.

---

[9] In addition to the bill of sale in McQuarrie's name and the security agreements, the government presented evidence that McQuarrie, not his father, had depreciated the TW 35 on his income tax returns and had maintained insurance coverage on the tractor through 2013. Moreover, despite his claim that he sold the tractor, his financial records revealed no such sale.

The government claimed, and the evidence revealed, that McQuarrie pledged the TW 35 tractor as collateral on July 20, 2011, acknowledging in the security agreement that he owned the property. The evidence clearly indicates that McQuarrie owned the tractor and had not sold it—either to his father or, as he suddenly claimed during his bankruptcy proceedings, to an unspecified individual in 2012.[10]  Yet, when FSA sought to repossess the tractor, McQuarrie disclaimed ownership and contended that the tractor, which he had moved to his father's farm, belonged to his father. Because these acts of concealment occurred in 2015, the district court did not err in denying McQuarrie's motion to dismiss Count 4.

**B. Sufficiency of the Evidence**

McQuarrie next contends that the evidence was insufficient to support his convictions. We review de novo a challenge to the sufficiency of the evidence. *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010). We ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In making this determination, "we refrain from independently judging the credibility of witnesses or weight of the evidence." *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996), *cert. denied*, 519 U.S. 1134 (1997); *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005) ("All conflicts

---

[10] Throughout the relevant time period, McQuarrie's representations about when he sold the tractor have changed. For instance, during his bench trial, McQuarrie claimed that ownership of the tractor changed prior to July 2011 and that he no longer owned the tractor at that point. That representation conflicts with his actions in 2011 when he repeatedly signed and initialed the security agreement providing that he was the owner of the collateral listed—which included the tractor. It also conflicts with the representations he made during his bankruptcy proceedings when his statement of financial affairs indicated that "[d]ebtor borrowed $18,000 from Green Stone in 2005 to purchase tractor and then sold it in 2012 for $14,000." R. 171-7, PID 884.

in testimony are resolved in the government's favor, and every reasonable inference is drawn in favor of the government.").

*1. False Statements-Counts 1 and 2*

Counts 1 and 2 of the fourth superseding indictment charged McQuarrie with knowingly making a false statement for the purpose of influencing the Secretary of Agriculture in connection with the restructuring of his existing FSA loans, in violation of 18 U.S.C. §§ 1014 and 1001(a)(2). A person commits a violation of 18 U.S.C. § 1014 (Count 1) if he:

> [K]nowingly makes any false statement or report . . . for the purpose of influencing in any way the action of the . . . Secretary of Agriculture acting through the Farmers Home Administration or successor agency . . . , upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor.

18 U.S.C. § 1014. 18 U.S.C. § 1001(a)(2) (Count 2) makes it a crime for an individual, "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, [to] knowingly and willfully . . . (2) [make] any materially false, fictitious, or fraudulent statement or representation."

McQuarrie contends that the evidence was insufficient to sustain these convictions because it supported his theory that his representations regarding the collateral were made in anticipation of his application for a conservation contract,[11] not for the purpose of restructuring his existing loans. McQuarrie Br. at 22.

---

[11] The trial testimony revealed that a conservation contract is one type of debt-relief program offered by the Department of Agriculture. In exchange for the farmer agreeing not to farm on certain types of highly sensitive land (land with endangered species, etc.), the Farm Service Agency provides a "noncash credit to reduce the customer's debt." R. 266, PID 3611.

We disagree. The government introduced testimony from James Monroe that he had explained the security agreement to McQuarrie in July 2011 and witnessed McQuarrie initial his approval of the agreement. In addition, Monroe testified that he had discussed with McQuarrie whether he wanted to wait on the conservation contract or wanted to go ahead and restructure the loans. Monroe testified that McQuarrie "chose to proceed with the closing to restructure the loans at that time." R. 268, PID 2684. Further, McQuarrie met with Betty Garrett in May 2012 to enter into the conservation contract after he restructured his loans. Despite his assertion now that he thought he had already done that in 2011, he never expressed any surprise in 2012 about having to re-execute documents to enter that program. McQuarrie's lack of confusion in 2012 further supports the jury's finding that he knew he was executing loan restructuring documentation in 2011. Thus, a reasonable jury could find that McQuarrie knew that he was executing new security agreements for the purpose of restructuring his existing loans in order to cure his delinquency on his loan accounts.[12]

### 2. Conversion—Counts 3-6

Counts 3 through 6[13] charged McQuarrie with conversion and concealment of property that had been pledged to the Farm Service Agency. 18 U.S.C. § 658 makes it a crime for an individual to, "with the intent to defraud, knowingly conceal[], remove[], dispose[] of, or convert[] to his own

---

[12] In his argument on sufficiency, McQuarrie complains that the district court refused to allow the jury to consider evidence—including his own statements to Agent McClutchey and documentation of the history of his interactions with the FSA—that he argues would have supported his theory that he believed he was executing conservation-contract paperwork and not loan-restructuring paperwork. However, a sufficiency-of-the-evidence argument considers whether the evidence at trial was sufficient to support the conviction. Because McQuarrie does not independently challenge the district court's evidentiary rulings regarding this evidence, we do not consider whether its exclusion was proper.

[13] Count 3 concerned livestock (cattle, hogs, and pigs); Count 4 concerned the TW 35 tractor; Count 5 concerned a 1150C dozer; and Count 6 concerned crops (specifically corn and soybeans).

use or to that of another, any property mortgaged or pledged to, or held by . . . the Secretary of Agriculture acting through the Farmers Home Administration or successor agency."

McQuarrie argues on appeal that there is insufficient evidence to support these convictions because 1) he did not own the collateral and one cannot convert that which he does not own, and 2) he was authorized to sell his livestock and crops to pay for the farm's operating expenses. McQuarrie Brief at 23. We consider each argument in turn.

In rejecting McQuarrie's first argument, the district court noted that McQuarrie identified no legal support for the proposition that one cannot convert property that they do not own, and it found that this argument was squarely contradicted by the plain language of the statute. R. 204, PID 112 (citing 18 U.S.C. § 658 which prohibits an individual from "conceal[ing], remov[ing], dispos[ing] of, or convert[ing] to his own use or to that of another, *any property* mortgaged or pledged to, or held by . . . the Secretary of Agriculture acting through the Farmers Home Administration or successor agency"). Moreover, the district court found that the evidence showed that McQuarrie represented that he owned the collateral charged in these counts when executing the security agreement. We find no error in the district court's reasoning.

McQuarrie's second argument fares no better. The security agreement gave the FSA a security interest in McQuarrie's crops, farm and other equipment, and livestock, including those items acquired in the future. McQuarrie was advised that the FSA's security interest would extend to equipment and livestock acquired after the security agreement was executed, and that he needed to seek permission before disposing of collateral that the FSA had an interest in. *See, e.g.*, R. 268, PID 2662-63; R. 171-2, PID 857 ("Debtor will . . . not abandon the collateral or encumber, conceal, remove, sell or otherwise dispose of it or of any interest in the collateral, or permit others to do so, without the prior written consent of Secured Party."). Nevertheless, without the consent of the

FSA, McQuarrie sold livestock (Count 3), equipment (Count 5), and crops (Count 6) that had been pledged to the FSA and did not account for the proceeds. He also concealed the TW 35 (Count 4) tractor on his father's farm and obstructed the FSA's attempts to repossess it. A reasonable jury could conclude that McQuarrie converted and concealed property that had been pledged to the Farm Service Agency. We affirm McQuarrie's convictions on Counts 3-6.

*3. False Statements Under Oath/Bankruptcy Fraud—Counts 7, 8, 10-12*

Counts 7 and 8 charged McQuarrie with making false statements under oath in violation of 18 U.S.C. § 152(2), which makes it a crime to "knowingly and fraudulently make[] a false oath or account in or in relation to any case under title 11." Count 7 charged McQuarrie with falsely testifying under oath that he had not sold any equipment during the two-year period before the filing of his bankruptcy petition. Count 8 charged McQuarrie with falsely testifying under oath that he had no interest in the newly opened Alpena General Store. Count 10 charged McQuarrie with making a false bankruptcy declaration in violation of 18 U.S.C. § 152(3)—which makes it a crime to "knowingly and fraudulently make[] a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11"—by fraudulently failing to 1) disclose all of his assets on his bankruptcy schedules, 2) disclose all sources of income, 3) disclose that his mother was his bookkeeper and was in possession of records that he claimed had been destroyed in a house fire, and 4) disclose interests in financial accounts owned by his mother and father. Count 11 charged McQuarrie with bankruptcy fraud stemming from the concealment of his assets in violation of 18 U.S.C. § 152(7), which makes it a crime for an individual to "knowingly and fraudulently transfer[] or conceal[] any of his property." Finally, Count 12 charged McQuarrie with conspiracy to commit bankruptcy fraud under 18 U.S.C. § 371

by "concealing money received from the sale of assets belonging to" him, in contemplation of his filing for bankruptcy. R. 103, PID 460.

There was ample evidence from which a reasonable jury could find that McQuarrie committed each of these offenses. As to Count 7, the government introduced testimony demonstrating that McQuarrie had sold several pieces of equipment within the two-year window. These transactions were confirmed by check deposit slips and, in some cases, by the testimony of the individuals who purchased the equipment from McQuarrie. As to Count 8, there was testimony that McQuarrie spoke to others about his plan to open the Alpena General Store. One of McQuarrie's friends testified that McQuarrie stated that he was selling the excavator to "free up some money to put in his store." R. 267, PID 2422. McQuarrie also met with city officials and business owners to plan for the store's opening. Although the store was put in McQuarrie's mother's name, she told Agent McClutchey that opening the store was McQuarrie's dream, but that he could not have the store in his name while he was in bankruptcy. A reasonable jury could conclude that McQuarrie knowingly and falsely disclaimed any interest in the store.

Sufficient evidence also supports McQuarrie's convictions on Counts 10-12, which all involve his failure to disclose his assets and sources of income during the bankruptcy proceedings in order to keep those assets from being reached by his creditors. The trial testimony revealed that some of the sales of livestock and equipment were done in his father's name, yet his mother's financial records treated the proceeds as McQuarrie's funds. In addition, McQuarrie failed to disclose that his mother possessed his financial records and that his money was kept in his parents' financial accounts. The concealment of the funds derived from the sale of McQuarrie's assets is sufficient to support his convictions.

### 4. Counts 13 and 14—Mail and Wire Fraud

Counts 13 and 14 charged McQuarrie with mail and wire fraud stemming from his fraudulent efforts to obtain reimbursement for contents of his house that were destroyed in a fire. McQuarrie contends that the evidence was insufficient to support these convictions because the government "failed to produce adequate evidence that the jurisdictional element—interstate use of a wire and mail communication" had been satisfied. McQuarrie Br. at 24.

In order to convict a defendant of mail or wire fraud, the government must prove that "the defendant devised or willfully participated in a scheme to defraud[,] . . . used or caused to be used an interstate wire communication [or the mails] in furtherance of the scheme [,] . . . and . . . intended to deprive a victim of money or property." *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (quoting *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted)).

The jurisdictional elements of both statutes are met by showing that the defendant acted with knowledge that the use of the mails or wires would "follow in the ordinary course of business, or that a reasonable person would have foreseen" their use. *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (jurisdictional requirement for mail fraud); *United States v. Prince*, 214 F.3d 740, 748 n.4 (6th Cir. 2000) (same explanation for wire fraud). "Accordingly, the government does not have to show that the defendant actually intended to cause the mails [or wires] to be used." *Frost*, 125 F.3d at 354. Moreover, the mailing or wire communication "need not be an essential element of the scheme," and it is sufficient if the mailing or wire communication is "incident to an essential part of the scheme or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (internal quotation marks and brackets omitted).

The evidence was sufficient to support McQuarrie's convictions for both mail and wire fraud. The evidence showed that after the fire, McQuarrie made a claim to his insurance company for the structure and the contents. The initial check for the structure was mailed to McQuarrie and deposited in an FSA-controlled supervised bank account. Later, McQuarrie faxed documentation in support of his claim for lost contents from his father's insurance agency in Michigan to the insurance company's offices in Ohio. That documentation was converted into digital format and saved on the company's servers. The information was then emailed from Ohio to a vendor in California who supplied a valuation of the items that McQuarrie listed. McQuarrie later mailed additional receipts, including the altered receipt for the hot tub, again from his father's insurance agency. In response to these new receipts, the insurance company mailed a check to McQuarrie that included the artificially inflated value of the hot tub. McQuarrie later went to the FSA to request the release of $30,824.82 for household contents, even though his insurance company had already reimbursed him for the same items. The FSA issued McQuarrie a check that, like others McQuarrie received, was deposited into his father's account and then immediately transferred to his mother's account for McQuarrie's benefit. That transfer involved the use of an interstate wire communication between a credit union in Michigan and a facility in South Dakota that recorded the transaction. After these funds were transferred into his mother's account, his mother wrote a check for $28,163 from that account to the FSA for the purpose of making McQuarrie's overdue payment on his loans.[14]

---

[14] McQuarrie argues that wire transfers between his parents' accounts are insufficient to establish the jurisdictional element. In support, he cites to a Tenth Circuit case, *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008), which reversed wire fraud convictions where the government failed to demonstrate that wire communications were an essential part of the scheme. *Id.* at 739. *Redcorn* is distinguishable. *Redcorn* determined that post-embezzlement wire transfers could not be used to satisfy the jurisdictional element because they were "purely incidental to the

This evidence was sufficient to support McQuarrie's convictions on these counts. He used the mails to submit the fraudulent hot-tub receipt and the wires to cover his double-recovery by having these funds pass into his parent's accounts, rather than his own. *See, e.g.*, *United States v. Kuehnemund*, 208 F. App'x 371, 374 (6th Cir. 2006) (finding evidence sufficient to support mail fraud conviction because the defendant "was interacting with an agent of an insurance company, the jury could reasonably conclude that Kuehnemund should have foreseen the use of the mails, or that use of the mails would follow in the ordinary course of business"); *United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003) (finding defendant's attempt to fax a letter sufficient for purposes of interstate electronic communication component of wire fraud).

## C. Exclusion of Evidence

In his briefing on the sufficiency challenge on Counts 10, 11, and 12, McQuarrie contends that the district court abused its discretion by excluding financial documents that he claimed would explain his reasons for selling or trading certain equipment to his father and depositing money into his mother's account. McQuarrie argued that he was indebted to his parents and sought to introduce a financial summary that would show that his parents paid more money to him between 2011 and 2015 than he paid to them. The district court excluded the evidence under Federal Rule of Evidence ("FRE") 403, finding that any marginal relevance was outweighed by the danger of unfair prejudice, jury confusion, and undue delay.

---

fraud" and lacked a close connection to the "mechanism of the fraud." *Id.* Here, McQuarrie's aim in seeking duplicate compensation from the insurance company was to obtain the funds he needed to pay his overdue loans, to do so as surreptitiously as possible (by having the funds deposited in his father's account), and to have beneficial access to the funds when they were moved to his mother's account for his use. Thus, there is a much closer connection between the wire communications involved in the insurance double-recovery scheme here than there was in the post-embezzlement transfers in *Redcorn*.

We review the district court's evidentiary rulings "only for abuse of discretion." *United States v. Morales*, 687 F.3d 697, 701-02 (6th Cir. 2012). Under this standard, "reversal is appropriate only if the abuse of discretion was not harmless error, that is, only if the erroneous evidentiary ruling affected the outcome of the trial." *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011).

Although we agree with McQuarrie that the evidence has some relevance, we conclude that any error from its exclusion was harmless because the evidence of guilt was otherwise overwhelming and the proposed evidence would only have provided weak support for McQuarrie's argument. *See United States v. Daneshvar*, 925 F.3d 766, 781 (6th Cir. 2019).

First, the evidence that McQuarrie acted in concert with his parents to conceal assets from his creditors was overwhelming. As noted, the government introduced evidence that McQuarrie put several of his assets in his parents' names, including his livestock and the Alpena General Store. He also sold some of his most valuable equipment in the two years preceding his filing for bankruptcy and funneled the proceeds through their bank accounts in order to prevent creditors from obtaining the funds. McQuarrie's justifications for selling the equipment do not immunize his conduct if he failed (as the evidence showed) to list these sales on his bankruptcy schedules. He also concealed his interests in other assets, including his livestock and the Alpena General Store, by putting the assets in his parents' names.

Moreover, we cannot conclude that exclusion of this evidence would have prejudiced McQuarrie where its admission would have only strengthened the government's case. The existence of the documents McQuarrie sought to introduce strengthens the government's case on Count 10 that McQuarrie falsely claimed that his financial records had been destroyed during the house fire. Admission of these financial documents to show McQuarrie's indebtedness to his

parents would also have offered an additional motive for the actions that defendants took— to ensure that McQuarrie's relatives were repaid before any other creditors, strengthening the government's case on Counts 10-12. Finally, admission of this evidence would have strengthened the government's claim that McQuarrie provided an incomplete list of his creditors on his bankruptcy schedules, since he neglected to include his parents as creditors. Therefore, to the extent that exclusion of this evidence was error, we find it harmless.

**D. Introduction of Additional Statements from McQuarrie's Interview**

In its case-in-chief, the government introduced portions of the recorded interview in which McQuarrie admitted using his father's cattle and equipment to inflate the "appearance of his operation" by "pi[ling] as much equipment on [his] farm to make it look like [he] was doing something." R. 171-10, PID 914. Those statements were admitted as statements of a party opponent under FRE 801(d)(2). During trial, McQuarrie sought to compel the government to play certain additional portions of that recording, claiming that the rule of completeness in FRE 106 required the introduction of these additional statements. The statements McQuarrie sought to introduce were portions of the interview where McQuarrie claimed that he was not aware that he was completing new security agreements in July 2011 and believed that the appraisal was for the purpose of entering into a conservation contract. The district court denied McQuarrie's request on the basis that these additional statements were inadmissible hearsay. On appeal, McQuarrie asserts that the district court abused its discretion by not requiring the government to play these additional portions—even if hearsay—under Rule 106.

We have held that the rule of completeness reflected in Rule 106 "covers an order of proof problem; it is not designed to make something admissible that should be excluded." *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982). Although we have sometimes been critical of the

rule, we have repeatedly held that "[e]xculpatory hearsay may not come in solely on the basis of completeness." *United States v. Adams*, 722 F.3d 788, 826 (6th Cir. 2013) (quoting *United States v. Shaver*, 89 F. App'x 529, 533 (6th Cir. 2004)); *United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009). Because our decisions make clear that McQuarrie's exculpatory hearsay statements should not have been admitted solely under Rule 106 and McQuarrie makes no other argument for their admission, the district court properly excluded these statements.

### E. Wire and Mail Fraud—Variance and Duplicitous Indictment

Shortly after the filing of the second superseding indictment, all three defendants requested that the district court order the government to provide a bill of particulars giving more specific information about the charges. The district court required the government to provide the specific dates of the transactions relevant to these charges. As to defendants' request for information regarding the nature of the scheme, the district court's order stated:

> the Government has provided a succinct summary of the factual basis for Count [13] See Gov. Resp. Mot. Sever at 6-7. Given those details, directing the Government to provide a bill of particulars which specifies the nature of the scheme would be redundant.

R. 77, PID 371. The portion of the government's response to McQuarrie's father's motion to sever that the district court cited explained that:

> As discussed during the most recent meeting in chambers between the court and all counsel, Scott McQuarrie's house was pledged as collateral for a FSA loan and insured through David McQuarrie's insurance agency. After the house was destroyed by fire, Scott McQuarrie collected $30,000 by mail directly from the insurance company for lost contents. Scott McQuarrie also tricked FSA into paying him $30,000 for lost contents out of the joint insurance check sent by mail to FSA and Scott McQuarrie to replace the structure, rather than the contents, destroyed by the fire. The "double-dipped" $30,000 check from FSA was negotiated through and wire transferred between financial accounts held by Yvonne and David McQuarrie. Yvonne McQuarrie then promptly wrote a $28,000 check to FSA on Scott McQuarrie's behalf to prevent the impending foreclosure of Scott McQuarrie's FSA loans and the resulting loss of his farming assets. Furthermore, the McQuarries also falsely claimed to FSA that Scott McQuarrie had obtained the

> $28,000 by selling cattle to David McQuarrie and thereby kept FSA from liquidating the cattle (FSA's collateral) located on Scott McQuarrie's farm when Scott McQuarrie was again in default on his FSA loan.

R. 66, PID 263-64. Because this summary only mentions the "double-dipping" scheme whereby McQuarrie obtained a duplicate check for lost household goods from the FSA and does not mention the hot tub, McQuarrie contends on appeal that the government's proof on these counts should have been strictly limited to the double-dipping scheme, and that because the district court permitted the government to introduce evidence of the hot-tub scheme, there was a variance from the indictment or, in the alternative, a duplicitous indictment. In denying McQuarrie's Rule 29 motion, the district court determined that no variance occurred and that even if there was a variance, McQuarrie did not explain how he was prejudiced by the variance. The district court also rejected McQuarrie's argument that the indictment was duplicitous. McQuarrie renews these arguments on appeal.

We review de novo whether there has been a variance from the indictment. *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003). A variance "occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006).

Count 13 alleged that McQuarrie "used and caused the use of the mail to send receipts to Scott McQuarrie's insurance company and caused another to mail checks that were fire insurance proceeds." R. 103, PID 465. Count 14 alleged that McQuarrie "transmitted and caused the transmission of writings, signs and signals by means of wire communication in interstate commerce." *Id.*

We first consider McQuarrie's argument that the government should have been strictly limited to the double-dipping scheme. McQuarrie contends that the district court's citation to the

government's response should have limited the government's proof at trial to the only scheme it disclosed in that response (the double-dipping scheme). We are not persuaded, for several reasons. First, the law provides that the government is strictly limited by a bill of particulars to the particulars "which *it* has specified." *United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965) (emphasis added). Here, McQuarrie asks us to limit the government's theory of proof based upon the district court's belief that the government's response to the motion to sever accurately reflected the government's complete theory on these counts. In effect, McQuarrie asks us to imply a bill of particulars that was never furnished and to limit the government's proof accordingly. We decline to do so.

Additionally, even if such an implied bill of particulars were appropriate under the law, there is no support for finding one in this record. There are good reasons to doubt that the government's response to McQuarrie's father's motion to sever reflected the full extent of the government's theory. First, the government was responding to McQuarrie's father's argument that joinder was not appropriate and that the counts should be severed because there was no legal or evidentiary connection between them.[15] In doing so, the government naturally emphasized those aspects of the fraudulent schemes where the McQuarries acted jointly, rather than on aspects like the altered hot-tub estimate where McQuarrie acted alone. The failure to mention the hot tub in no way indicates that this information was not also considered part of the charged mail or wire fraud. Second, the government did include evidence relevant to the hot tub when it filed its bill of

---

[15] McQuarrie's father's motion argued that: 1) "[t]he [d]efendants are not properly joined because the indictment does not allege that defendants 'have participated in the same act or transaction, or in the same series of acts or transactions'" and 2) if joinder of the defendants was proper, the district court should nevertheless sever the counts and have three trials given the absence of a legal and evidentiary connection between the counts. R. 61, PID 215.

particulars. The government was required to specify the relevant dates for the mail and wire fraud charges. In its second amended bill of particulars, the government added the dates that the altered receipt and the inflated insurance check were mailed and highlighted these changes by listing these dates in bold-face type. Thus, the bill of particulars the government *did* furnish—and the one it *was* strictly limited by—included the hot-tub scheme. This is confirmed by the government's pre-trial disclosures. The government produced a witness list that included the name of the man who sold the hot tub to McQuarrie. In addition, the government's exhibit list included the altered receipt.

Given these disclosures, the government's theory on these two counts fairly included both schemes, and we agree with the district court that the allegations in the indictment did not materially vary from the proof at trial. As such, proof of both during trial did not constitute a variance from the fourth superseding indictment.

We next consider McQuarrie's argument that charging both schemes in the same count constitutes a duplicitous indictment. Because McQuarrie did not object before trial or challenge the jury instructions on this count, we review only for plain error. *United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2002). "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *Id.* at 443 (quoting *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002)). "In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Mastelotto*, 717 F.2d 1238, 1244 (9th Cir. 1983), *abrogated on other grounds by United States v. Miller*, 471 U.S. 130, 135 (1985). Thus, "if the indictment may be read to charge but one crime in each count, the court will do so." *United States v. Dolan*, 99 F.3d

1140, at *3 (6th Cir. 1996) (table) (quoting *Mastelotto*, 717 F.2d at 1244)). We have also cited with approval decisions of other circuits that recognize that "the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme." *Id.* (citing decisions of the Fifth and Ninth Circuits).

We conclude that these counts charged one scheme that involved the defrauding of different victims over an extended period using different representations. In short, the government alleged, and the evidence demonstrated, that in the wake of McQuarrie's house fire, he devised a scheme whereby he could fraudulently receive extra compensation from both his insurance company and the FSA. That this scheme allowed McQuarrie to defraud two entities using different means does not render the indictment duplicitous.

## F. Prosecutorial Misconduct in Closing Arguments

McQuarrie argues that the government committed misconduct during its rebuttal argument when it asserted that there were additional portions of McQuarrie's interview with Agent McClutchey that it desired to play. McQuarrie Br. at 34.

Usually, such allegations of prosecutorial misconduct "contain questions of fact and law that we review *de novo*." *United States v. Green,* 305 F.3d 422, 429 (6th Cir. 2002) (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). However, McQuarrie did not object when the prosecutor made these allegedly improper statements, so our review is for plain error only. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). In reviewing a challenge to a prosecutor's remarks, we examine the context in which the remarks were made, including "whether, and to what extent, the prosecutor's improper remarks were invited by defense counsel's argument." *Id.* (citing *United States v. Young*, 470 U.S. 1, 12 (1985)). If the prosecutor's remarks

were "invited[] and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Young*, 470 U.S. at 12-13.

Because context is key, we focus first on McQuarrie's closing remarks, where his counsel made the following statement:

> You got only one side of the story from the Government when they wanted to present their case, and only portions of evidence from them, and then we had to pull the rest out of these witnesses at times. And at times they didn't want to say it, at times I didn't get them to go that far, and at times I did get them to come all the way where I wanted them to be to show what the full picture was. And you got to ask yourself, why is it that with a two hour recorded statement, that the Government only plays for you three minutes? Why is it that with a running record with FSA of years and years and years, they only show you a portion? Why is it that with bank records, they only want you to see a portion?
>
> . . .
>
> That's the lack of evidence. That's where you were not fully informed by the Government about each individual count. They played hide the ball from you. They hid these things from you. It was their choice how they wanted to present their case, and they're going to have to live with that choice.

R. 272, PID 4366. In response to these comments, the prosecutor argued during rebuttal that:

> And so far what I've heard from the defense is fast and loose. They've accused the Government of playing fast and loose; and, for example, they tossed out to you during their closing, well there's a two and a half hour interview but they only, the Government only puts in a portion of that. Well, the judge has already instructed you, the Rules of Evidence exist to insure a fair and just trial. The judge decides what evidence comes in, not the Government, not the defense. The judge does. So it's not a fair assertion to say, oh, this is what the Government's done. If what we've done was wrong, the judge would have addressed it. You're here to consider the evidence that's admitted.

*Id.* at PID 4412.

Reviewing for plain error only, we conclude that any improper comments were invited by defense counsel's opening remarks. Viewed in context, the prosecutor's comments did no more than respond substantially to McQuarrie's closing statement accusing the government of hiding

other evidence that would have supported McQuarrie's case. These responsive comments are insufficient to warrant a reversal of McQuarrie's convictions.

## G. Obstruction-of-Justice Enhancement

The PSR assessed two separate obstruction-of-justice enhancements, one related to McQuarrie's comments during the first jury trial and one related to alleged threats he made against individuals who placed bids on his farm during the foreclosure sale. On appeal, McQuarrie challenges only the obstruction-of-justice enhancement related to his interruption of voir dire.

Under USSG § 3C1.1, an enhancement for obstruction of justice is warranted if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

The government must "prove by a preponderance of the evidence that the defendant 'willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice.'" *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (citing *United States v. Parrott*, 148 F.3d 629, 635 (6th Cir. 1998)); *see also United States v. Shearer*, 479 F.3d 478, 484 (7th Cir. 2007) (noting that the burden of proof extends to proving that the defendant's conduct was "willful and made with the intent to interfere with the proceeding and affect the outcome").

We note that the appropriate standard of review for this guideline section is not clear. A panel of our court recently explained that while we review legal conclusions de novo and factual findings for clear error, we have sent mixed messages about how we review "the application of the guideline to the facts—that is, the decision whether the historical facts rise to the level of obstruction under § 3C1.1." *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). Our past cases have sometimes applied clear-error review, de novo review, or a hybrid of the two. *Id.* at

608. The *Thomas* court did not resolve the question because it determined that even applying de novo review, the enhancement was properly applied. *Id.* at 610. Not surprisingly, the parties dispute the proper standard of review. McQuarrie argues that we should review the district court's "factual findings for clear error and its legal conclusions in applying the guidelines to the facts *de novo*." McQuarrie Br. at 36. The government argues that the propriety of the enhancement should be reviewed under the deferential clear-error standard because the district court was in the best position to determine whether McQuarrie's conduct was obstructive. Government Br. at 48. We need not resolve the standard of review issue because we conclude that even under the deferential standard the government proposes, the enhancement was not supported.

A week after the first jury selection was halted, McQuarrie appeared before the district court for a hearing on two separate motions: McQuarrie's counsel's motion to withdraw and the government's motion seeking McQuarrie's detention pending trial. During that hearing, McQuarrie's counsel explained that McQuarrie became angry because his counsel sent him a letter on the eve of trial that summarized the case, explained counsel's perception of the case, and reiterated the government's plea offers. McQuarrie interpreted that letter as indicating that his counsel was unable or unwilling to defend him at trial. In denying the motion to withdraw, the district court stated that it observed[16] McQuarrie interfere "by all appearances intentionally, with the selection of the jury this past week." R. 126, PID 558. The district court later repeated its conclusion that McQuarrie "has obstructed the entire process of attempting to select a jury" when granting the government's motion for detainer pending trial. *Id.* at PID 565. The district court

---

[16] Although the magistrate judge conducted voir dire, the district court judge observed the proceedings by closed-circuit television.

gave no reasons in support of its conclusion that McQuarrie's conduct was intentionally designed to thwart jury selection.

It does not appear that we have yet decided whether an obstruction-of-justice enhancement may be properly applied to a defendant whose conduct has been found to be a willful attempt to disrupt and delay his own trial. Other circuits have ruled that such in-court conduct may qualify under § 3C1.1. We need not definitively answer that question, however, because we conclude that even if such conduct can support an enhancement, there is insufficient evidence in the record to support the enhancement here. Those courts that have upheld obstruction-of-justice enhancements when defendants delay or disrupt court proceedings have done so when the evidence of the defendant's intent was clear. For example, the Eleventh Circuit affirmed application of the enhancement where defendants threatened persons involved in their prosecutions or sentencings. *See, e.g.*, *United States v. Addison*, 683 F. App'x 921, 923 (11th Cir. 2017) (upholding obstruction enhancement because defendant sent prosecutor a threatening letter in an attempt to delay or disrupt sentencing hearing); *United States v. Perkins*, 787 F.3d 1329, 1333 (11th Cir. 2015) (affirming obstruction enhancement imposed because defendant threatened U.S. marshals, the judge, and other court officials). Other circuits have upheld the enhancement in similar circumstances but have cautioned that the district court should avoid applying the enhancement where the defendant's motives are in doubt. *See, e.g.*, *United States v. Gentry*, 941 F.3d 767, 778 (5th Cir. 2019) (noting that "[d]istrict courts must also avoid applying the obstruction-of-justice sentence enhancement in a manner that will discourage defendants from actively participating in their own defenses and asserting their constitutional right to effective assistance of counsel");[17]

---

[17] Although the Fifth Circuit affirmed application of the enhancement in *Gentry*, it did so based on the district court's finding that the defendant created a "false, contrived conflict" with his

*United States v. Wilbourn*, 778 F.3d 682, 684 (7th Cir. 2015) (ultimately upholding obstruction enhancement because defendant exaggerated his mental defects in order to delay the criminal proceeding for months, but noting that "when in doubt about the bona fides of the defendant's behavior . . . the judge should not find an obstruction of justice").

The dissent contends that there is sufficient evidence in the record to warrant the enhancement and frames the issue as a choice between two versions of what transpired during voir dire: either McQuarrie was simply exercising his constitutional rights and sat down when instructed to do so or he intentionally disrupted the proceedings and "[d]espite a directive from the Court to cease speaking[,] . . . continued to assert objections to his counsel and the alleged unfairness of the proceedings." Dissent Op. at 1 (citing government's explanation, R. 97, PID 438). Under the dissent's view, the district court's later adoption of the government's version and its conclusory finding that McQuarrie acted "intentionally" to disrupt his trial are sufficient, without more, to meet the government's burden. We disagree.

As an initial matter, the government's version of events is not entirely consistent with the record. When McQuarrie first began speaking, the magistrate judge did not give him a "directive to cease speaking," as the government contends, but rather explained that "we will discuss that at sidebar." R. 276, PID 4631. The government's theory presumes that McQuarrie, a defendant with no prior criminal record, would have understood this comment as a direction to immediately sit down and stop speaking. When the magistrate judge interjected again and directed McQuarrie to sit down so that the discussion could continue outside the presence of the venire, he complied.

---

attorney and repeatedly requested to substitute counsel, necessitating several hearings on the issue. The record here is devoid of such repetitive, obstructive conduct.

Thus, the record undermines the government's position that McQuarrie disobeyed an explicit directive to cease speaking.

In addition, it is the government's burden to prove by a preponderance of the evidence that McQuarrie's conduct was intentional. On this point, the dissent suggests that we must afford great deference to the district court's determination of McQuarrie's intent. While that is true, where, as here, the enhancement is based on the district court's subjective impressions, we have generally required district courts to make specific factual findings about the reasons it came to a conclusion in order to ensure effective appellate review. *See, e.g.*, *United States v. Range*, 982 F.2d 196, 198 (6th Cir. 1992) ("At the very least, the appellate record must contain enough detail to satisfy us that the conduct in question was intended to intimidate witnesses . . . [the district court] should describe on the record the indicia that led to this conclusion."); *United States v. Lineberry,* 7 F. App'x 520, 524 (6th Cir. 2001) ("When, as in the case *sub judice*, the defendant has properly objected to an obstruction of justice increase, the trial court should make specific factual findings which evince the defendant's willful impediment of justice."). We share the dissent's concern about the obstacle that an "impersonal transcript" poses to effective review, but that is why it is imperative for a district court to explain what considerations led to its conclusions. Despite McQuarrie's challenge to the obstruction enhancement, the district court did not explain why it concluded that McQuarrie's conduct was intentional.

Given the plausible explanation for McQuarrie's conduct—the letter sent on the eve of trial making him question whether he was receiving and would receive effective assistance of counsel—, the absence of any past episodes of McQuarrie's attempts to obstruct court proceedings, the guidelines' explanation that the obstruction-of-justice enhancement "is not intended to punish a defendant for the exercise of a constitutional right," USSG § 3C1.1, Application Note 2, and the

absence of any explanation for the district court's conclusion, we conclude that application of the enhancement was erroneous. We vacate the district court's assessment of the obstruction-of-justice enhancement based on McQuarrie's voir dire conduct, as well as the imposition of the associated costs, and remand for resentencing.

### III.

We **AFFIRM** McQuarrie's convictions, **VACATE** his sentence, and **REMAND** for resentencing.

**ALICE M. BATCHELDER, Circuit Judge,** dissenting in part. I join the majority's opinion in full, except for Part II.G. Because this court is ill-equipped to review factual determinations, I would affirm the district court's obstruction-of-justice enhancement and imposition of sanctions.

Scott McQuarrie and the government give two different accounts of the incident that led to the obstruction-of-justice enhancement. McQuarrie claims that he was only exercising his constitutional rights by asking for a new attorney and that he "did not speak over the court, he did not raise his voice, and he sat down when instructed by the court." Meanwhile, the government frames the incident as a disruptive outburst and alleges that "Scott McQuarrie rose to his feet without invitation or permission from the court and began to address the court orally. Despite a directive from the Court to cease speaking, Scott McQuarrie continued to assert objections to his counsel and the alleged unfairness of the proceedings." The magistrate judge did not view the incident as severe enough to grant Scott's co-defendant parents' motion for a mistrial, but the magistrate judge did find it necessary to discharge the jury venire because there was a sufficient likelihood of prejudice to Scott's parents.

The district court judge held that McQuarrie's behavior was obstructive because it delayed his trial and caused public expense. The court assessed an obstruction-of-justice enhancement under U.S. Sentencing Guidelines ("USSG") § 3C1.1, which states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

So, whose story are we supposed to believe? Typically, the standard of review helps resolve that question, but as the majority correctly notes, the appropriate standard of review is not clear. As our court recently described:

> [W]e note that our court has sent mixed messages on the standard of review for this guideline [§ 3C1.1]. All agree that an appellate court reviews "legal conclusion[s]," including the interpretation of § 3C1.1, "without the slightest deference." *U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, ⸺ U.S. ⸺, 138 S. Ct. 960, 965, 200 L.Ed.2d 218 (2018); *United States v. Cole*, 359 F.3d 420, 425 (6th Cir. 2004). And all agree that it reviews "historical" fact findings—"who did what, when or where, how or why"—for clear error. *U.S. Bank*, 138 S. Ct. at 966; Cole, 359 F.3d at 425. But how should it review the

application of the guideline to the facts—that is, the decision whether the historical facts rise to the level of obstruction under § 3C1.1?

> Our cases have not been a model of clarity. Some have reviewed de novo the application of § 3C1.1 to the facts. *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018). These cases reason that the issue qualifies as "a mixed question of fact and law," which we have traditionally answered without deference to the district court. *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012); *cf. Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Others have applied clear-error review. *United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002). These cases rely on 18 U.S.C. § 3742(e) (which directs appellate courts to "give due deference to the district court's application of the guidelines to the facts") and *Buford v. United States*, 532 U.S. 59, 121 S. Ct. 1276, 149 L.Ed.2d 197 (2001) (which holds that § 3742(e)'s deference rule applies to guidelines that turn mostly on each case's facts, *id*. at 64–66, 121 S. Ct. 1276). Still other cases have incorporated both standards, noting that courts should review de novo "whether facts constitute obstruction of justice," but also should "give due deference to the district court's application of the guideline to the facts." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citations omitted).

*United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019). For the district court's factual findings, § 3742(e) clearly requires us to review those findings under the deferential clear-error standard of review and mandates that we should "give due regard to the opportunity of the district court to judge the credibility of the witnesses." For the district court's application of the law to the facts, our most recent circuit precedent has appeared to establish that we review those findings de novo, including "whether conduct constitutes 'obstruction of justice' under Guidelines § 3C1.1." *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018) (citing *United States v. Amerson*, 886 F.3d 568, 578 (6th Cir. 2018)).

However, the majority reasons that it "need not resolve the standard of review issue because we conclude that even under the deferential standard of review the government proposes, the enhancement was not supported." Maj. Op. at 28. Likewise, the majority declines to reach the question of whether intentionally disrupting and delaying one's trial warrants an obstruction-of-justice enhancement. *Id*. at 29. Instead, the majority holds that even under a deferential standard of review, and assuming the conduct could warrant the enhancement, there was insufficient evidence to support the conclusion that McQuarrie intentionally sought to disrupt or delay his trial. *Id*. The majority claims that there was a "plausible explanation" for McQuarrie's conduct and cites to the letter he received before trial, which led him to question the effectiveness of his counsel; the absence of previous obstruction attempts; the language in

§ 3C1.1, Application Note 2, explaining that the enhancement "is not intended to punish a defendant for the exercise of a constitutional right"; and a lack of an explanation from the district court. *Id*. at 31-32.

But setting aside the question of whether this kind of disruptive conduct warrants the enhancement, the root of the issue—and of the majority's questioning the district court's judgment—is whether McQuarrie *intended* to obstruct or delay. *See* USSG § 3C1.1 (the enhancement is appropriate if "the defendant *willfully* obstructed or impeded, or *attempted* to obstruct or impede the administration of justice") (emphasis added). And questions of intent are not something which this court is well-suited to decide. The Supreme Court has explained why the Courts of Appeals should give deference to the district court for factual findings:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be "the 'main event' . . . rather than a 'tryout on the road.'" *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). For these reasons, review of factual findings under the clearly-erroneous standard—with its deference to the trier of fact—is the rule, not the exception.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574-75 (1985).

How would a person normally attempt to discern whether an animated proclamation was a sincere invocation of one's rights or a sly attempt to delay a likely punishment? We would look to the individual's tone of voice, facial expressions, body language, and other non-verbal cues. *See id*. at 575. ("[F]or only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). The magistrate judge witnessed the outburst in-person and the district court judge watched on closed-circuit television. The district court judge explained, as the majority noted, that it "*observed* [McQuarrie] interfere" with the jury selection process, "by all appearances, intentionally." R. 126, PID 558 (emphasis added). Moreover, the magistrate judge and the district court judge had not only the specific knowledge of developing a familiarity and understanding of McQuarrie and

his behavior through the course of the proceeding, but also a general experience of routinely determining issues of intent as a function of their jobs as judges who oversee trials.

In contrast, this appellate panel has not had the luxury to view the incident in person or even a recording of the episode. Discerning intent is a difficult task even before factoring in our physical and temporal separation from the incident. And we have only the two-dimensional, impersonal transcript of the trial to assist in our judgment. Consequently, we cannot—and should not—attempt to determine whether such an outburst was sincere or sinister. We are in no better position to discern McQuarrie's intent than we are to determine the credibility of the witnesses who testified. *See Anderson*, 470 U.S. at 575. ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, . . . that finding, if not internally inconsistent, can virtually never be clear error.").

For these reasons, I would hold that there was sufficient evidence for the district court's assessing the obstruction enhancement and the corresponding imposition of sanctions. If the majority reached this conclusion, the panel would have to determine (1) whether the conduct—*i.e.*, the intentional disruption—warrants an obstruction-of-justice enhancement and (2) the appropriate standard of review. But because of its insufficiency-of-the-evidence conclusion, the majority appropriately leaves those two questions for another day. Maj. Op. at 28, 29. Other courts have held that such conduct warrants an obstruction enhancement, but I agree with the majority that our circuit has yet to address the issue. *See, e.g., United States v. Greer*, 158 F.3d 228, 232-33, 241 (5th Cir. 1998) (describing why the district court imposed an obstruction enhancement in part due to the defendant's courtroom outbursts, but affirming the enhancement on another ground). Regardless, our reviewing the district court's finding of intent cannot be the basis for reversal; therefore, I respectfully dissent.